605 F.2d 1307
 UNITED STATES of America, Appellee,
v.
Joseph DIANA, Billy Joe Robertson, Maurice Leon Jones,
Robert Wade Jenkins, Thomas Stabile, Wayne Thomas Huey, John
Pelligrino, Michael Elton Burnham, Ralph Frank Volino,
Michael Ervin Catoe, Robert Melton, David Donnell White, Appellants,
and
Anthony Milia et al., Defendants.
UNITED STATES of America, Appellee,
v.
David Donnell WHITE, Appellant.
 Nos. 78-5053, 78-5054.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 12, 1979.
Decided Aug. 29, 1979.
 
 Ronald P. Fischetti, New York City (Fischetti & Shargel, New York City, on brief), for appellants.
 Thomas P. Simpson, Asst. U. S. Atty., Columbia, S. C. (Thomas E. Lydon, Jr., U. S. Atty., Columbia, S. C., on brief), for appellee.
 Before FIELD, Senior Circuit Judge, and WIDENER and HALL, Circuit judges.
 WIDENER, Circuit Judge:
 
 
 1
 The appellants were convicted under 18 U.S.C. § 371 for conspiring to transport and distribute stolen automobile engines and parts. The indictment charged 25 defendants with one count of conspiracy and numerous substantive offenses. All the substantive counts were dismissed before the case went to the jury. With respect to the conspiracy count, the charges against 3 defendants were so dismissed. Of the remaining 22 defendants, the jury acquitted 10 defendants and convicted 12 defendants who are the appellants in these cases.
 
 
 2
 The basic theory of the government's case was that the defendants participated in a conspiracy in which defendants in New York supplied stolen auto parts to salvage dealers in North and South Carolina. The conspiracy involved four groups: the New York suppliers, the transporters, the principal receivers who stored the property and transferred it to the ultimate receivers. None of this last group were convicted. Trial of the case lasted two and one-half months, and was remarkably error free as shown by the fact that the defendants raise only three issues on appeal. We find the assignments of error to be without merit and affirm the convictions.
 
 
 3
 * Defendants' first argument is based on what is claimed to be a fatal variance between the allegations in the indictment and the proof at trial. The essence of the argument is that the indictment alleged one overall conspiracy, but the proof at trial showed many separate conspiracies. Thus, so the argument goes, the individual conspiracies should have been tried separately, and the failure to do so prejudiced the defendants' right to a fair trial and requires reversal of their convictions under the authority of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).
 
 
 4
 The crux of the appellants' position is that the ultimate receivers were joined improperly with the other three groups of defendants since the ultimate receivers were not aware of or a part of the overall conspiracy. In support of their position, appellants point to the fact that all the ultimate receivers were acquitted. This, they say, is proof certain that the overall conspiracy charged in the indictment did not exist. Having thus found the non-existence of the overall conspiracy charged, the defendants then call upon the rule in Kotteakos to demonstrate that they should not have been tried and that their convictions ought to be reversed on that account. They also argue that they were prejudiced because the decision to join the ultimate receivers made the trial unnecessarily lengthy and complex. The latter argument essentially is that the government should not be allowed to bring in an additional group of defendants in order to complicate an already complicated trial.
 
 
 5
 While we feel that the argument of spillover prejudice is speculative at best, for the risk exists in each case of prosecution of multiple defendants, we need not base our decision on that conclusion, for we hold that the substance of appellants' argument is without merit. As noted above, appellants' rely on Kotteakos. We feel that they read that case too broadly. The jury in Kotteakos, after being instructed on the single conspiracy theory which was alleged in the indictment, found eight defendants guilty of conspiring to defraud the government. Most of the defendants had no connection with each other except their separate and independent use of the defendant Brown to secure fraudulent government loans. The Supreme Court reversed all the convictions and held that the jury could not possibly have found, on the evidence in the record, that there was only a single conspiracy. The government had admitted as much when it described the case as ". . . separate spokes meeting in a common center," although, as the Court noted, "without the rim of the wheel to enclose the spokes." 328 U.S. at 755, 66 S.Ct. at 1243.
 
 
 6
 The facts of Kotteakos are far different from the case at bar. Here, there was evidence from which a jury could have found a single four-link conspiracy. Although such proof proved in vain when the jury acquitted the ultimate receivers, there was evidence on which a finding of a single four-part conspiracy might have been based, and it was not error here, as it was in Kotteakos, for the judge to instruct the jury. Furthermore, the mere fact that the ultimate receivers were acquitted does not show that this was a case of many separate conspiracies rather, it simply shows no more than that the jury thought the ultimate receivers were not guilty under the instructions of the court. The general verdict says nothing about the proof of a single three or four-part conspiracy, but of course goes only to the ultimate question of guilty or not guilty.
 
 
 7
 In sum, there was evidence to show a single four-link conspiracy even though the jury did not convict the members of the fourth link in the chain.[1] Thus, there is no error in indicting and trying the ultimate receivers of the stolen property. The government need not win its case against all defendants in a conspiracy case in order to avoid a charge of variance. To hold otherwise would be to invite a finding of a fatal variance between indictment and proof whenever one discrete group of defendants is acquitted in a conspiracy case.
 
 II
 
 8
 The next assignment of error requires close attention. In proving its case, the government relied on evidence obtained through electronic surveillance of telephonic and oral conversations. The defendants moved to suppress this evidence on the ground that the government failed to seal the tape recordings of the conversations in the manner required by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. Specifically, § 2518(8)(a) states:
 
 
 9
 "The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire or oral communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517."
 
 
 10
 The essential facts concerning the sealing of the tapes may be stated briefly. The electronic surveillance of telephone conversations was conducted between March 22, 1977 and April 11, 1977 pursuant to court authorization. Each of five machines was set up to make two simultaneous recordings, one labeled "original" and one "duplicate original." Two logs, an original and a carbon copy, were kept. At the end of each day of surveillance, the original tapes were placed in envelopes which were sealed and initialed by the F.B.I. agent in charge. Upon the termination of the surveillance on April 11, the original and duplicate original tapes were transported to the F.B.I. office in Rock Hill, South Carolina. On April 13 the United States Attorney instructed the agent in charge of the tapes to place the originals in sealed boxes and to keep them in the F.B.I. office until further notice. On May 20, pursuant to further instructions from the United States Attorney, who was directed by the district court, the tapes were delivered to the United States Marshal in Columbia, South Carolina for formal sealing.
 
 
 11
 The first question raised is precisely when the tapes were sealed within the meaning of the statute. The district judge, who also presided at trial of this case, gave an oral sealing order to the United States Attorney.[2] Neither the court nor the United States Attorney kept any written record of the order or of the date on which the order was given. The United States Attorney testified at the suppression hearing that he had telephoned the district judge and received the order some time between April 11 and May 20; he was unable to assign the date with any more specificity. The district judge stated that he had in fact given the order by telephone, probably between April 25 and May 20, since he had been unavailable prior to April 25 for reasons of health. Both the district judge and the United States Attorney stated that the order had directed the tapes to be delivered to the United States Marshal for formal sealing, and such delivery in fact took place on May 20. At oral argument the government argued that the actual sealing must have occurred on April 13, but there is no need for us to decide the exact date because, for purposes of this appeal, we give the defendants the benefit of any doubt and assume that the order to seal the tapes as required by the statute was given on May 20, a 39 day delay.
 
 
 12
 Thus, we also assume that the tapes were not sealed "immediately." The issue which remains, then, is whether the government has provided "a satisfactory explanation" for such failure. That question is one of first impression in this circuit.
 
 
 13
 In interpreting the "satisfactory explanation" provision, we must first place it in context with other provisions of Title III. Section 2515 imposes exclusionary sanctions to compel compliance with prohibitions of the chapter. It states:
 
 
 14
 "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."
 
 
 15
 Section 2515 should be read in conjunction with § 2518(10)(a) which spells out the grounds on which wiretap evidence may be suppressed, and those who may make the motion. See 1968 U.S.Code Cong. & Admin.News p. 2112 at 2184-85, Senate Report No. 1097. Subsection (10)(a)[3] in pertinent part is:
 
 
 16
 "Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that
 
 
 17
 (i) the communication was unlawfully intercepted;(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
 
 
 18
 (iii) the interception was not made in conformity with the order of authorization or approval."
 
 
 19
 The section we are immediately concerned with, § 2518(8)(a), and the only one under which the defendants claim, as previously noted, has its own independent exclusionary provision for the omission of sealing, as well as its own exception to that provision, so the exclusionary provisions of §§ 2515 and 2518(10)(a) need not necessarily control.
 
 
 20
 The Supreme Court has made it clear that not every violation of the statute requires suppression of the wiretap evidence. United States v. Donovan, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); United States v. Chavez, 416 U.S. 562, 574-75, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Chavez dealt with 18 U.S.C. § 2516(1) which requires that the official authorizing the wiretap be identified and provides that the wiretap may be approved by the Attorney General or a specially designated Assistant Attorney General. In Chavez, a wiretap on one Fernandez was excluded for improper authorization; however, the Chavez wiretap, which misidentified the authorizing officer, but in fact had been properly authorized, was admitted into evidence. Donovan concerned 18 U.S.C. § 2518(1)(b)(iv) which requires the government to identify, in its application for a wiretap, the person whose communication is to be intercepted, and § 2518(8)(d) which requires, in part, the issuing judge to give notice to the persons whose communications were intercepted. Donovan and two others had received proper notice under (8)(d), but were not named in the applications as required by (1)(b)(iv). Two other defendants were inadvertently not listed in the notice documents and thus were not given proper notice. Despite these violations, the Court refused to suppress the evidence for either violation, holding that neither provision played a central role in the overall purpose of Title III.
 
 
 21
 Based on Chavez and its companion case, United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), the Ninth Circuit has developed the following three-part test to determine if wiretap evidence obtained in violation of the statute should nevertheless be admitted at trial:
 
 
 22
 "In resolving this issue (whether post-interception violations of Title III fall within (10)(a)(i)) Chavez and Giordano suggest that there are several important factors which should be considered. As an initial matter, it must be determined whether the particular procedure is a central or functional safeguard in Title III's scheme to prevent abuses. . . . If this test has been met, it must also be determined whether the purpose which the particular procedure was designed to accomplish has been satisfied in spite of the error. . . . While in most situations it would not be necessary to reach beyond the above-mentioned factors, it may be that in some instances they will not be completely determinative. In such cases, Chavez implicitly suggests a third factor which may have a bearing on the issue i. e. whether the statutory requirement was deliberately ignored; and, if so, whether there was any tactical advantage to be gained thereby."
 
 
 23
 United States v. Chun, 503 F.2d 533, 542 (9th Cir. 1975).
 
 
 24
 While the Supreme Court has not spoken to the relationship between (10)(a) and (8)(a), as discussed above, the Court has held that not every violation of Title III requires exclusion of the evidence obtained in violation of the statute. A court should determine the purpose of the provision in question and must determine if the requirement is central to the overall Congressional scheme. Section 2518(8)(a) contains its own provision for exclusion, but also has its own exception for a satisfactory explanation. We feel a relevant inquiry is the effect, if any, the Supreme Court's interpretation of (10)(a) in Chavez and Donovan has on the scope of the " satisfactory explanation" exception. We also feel that a consideration of (10)(a) and the Chun test, especially in the determination of the purpose of (8)(a), would be relevant in determining whether or not a satisfactory explanation was provided. If the inquiry into the proffered explanation reveals that the purpose of the statute was carried out, then this fact would have at least some bearing on whether the explanation was satisfactory. The Third, Fifth and Seventh Circuits all have gone at least this far. United States v. Falcone, 505 F.2d 478 (3d Cir. 1974), cert. den., 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975); United States v. Diadone, 558 F.2d 775 (5th Cir. 1977); United States v. Lawson, 545 F.2d 557 (7th Cir. 1975). Thus, we feel that Chavez, Donovan and Chun are persuasive in (8)(a) cases.
 
 
 25
 Turning more directly to the scope of the satisfactory explanation provision, we note that four circuits have dealt with sealing delays which violated § 2518(8)(a). In Falcone, supra, the (8)(a) violation was admitted, but the Third Circuit held that the evidence should not be suppressed because the trial court had found, after an extensive hearing, that no one had tampered with the tapes.[4] The court expressed its holding as follows: "Therefore, all we hold is that where the trial court has found that the integrity of the tapes is pure, a delay in sealing the tapes is not, in and of itself, sufficient reason to suppress the evidence obtained therefrom." 505 F.2d at 484.
 
 
 26
 The Seventh Circuit has twice dealt with this issue. In Lawson, supra, the court analyzed this question exclusively under (10)(a)(i) and held that since the purpose of the sealing requirement (the integrity of the tapes) was not challenged, the wiretap evidence should not be suppressed despite a virtually unexplained delay of 57 days. More recently, the Seventh Circuit expanded on the Lawson approach in United States v. Angelini, 565 F.2d 469 (7th Cir. 1977). In Angelini the court adopted a two-step approach. The first inquiry is whether a satisfactory explanation is given. If there is, the evidence is admissible. If not, then (10)(a) and the three-part Chun test, discussed above, are applied. Thus, in the Seventh Circuit either a satisfactory explanation or compliance with Chun is sufficient, in and of itself, to allow the wiretap evidence to be admitted despite a violation of the sealing requirement.
 
 
 27
 The Fifth Circuit also has refused to suppress evidence for (8)(a) violations. United States v. Diadone, 558 F.2d 775, 780 (5th Cir. 1977); United States v. Sklaroff, 506 F.2d 837 (5th Cir. 1975), cert. den., 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975). In each case, a central rationale for decision was the fact that the integrity of the tapes was not challenged. Additionally, in Sklaroff the government explained the 14 day delay by stating that the tapes remained in the F.B.I. evidence room for 7 days and that the other 7 days were used in the preparation of search warrants. The court held there was a substantial compliance with the statute. In Diadone, no explanation was discussed by the court; the admitted integrity of the tapes was sufficient to allow their admission into evidence.
 
 
 28
 The Second Circuit has had several cases on this subject. In United States v. Poeta, 455 F.2d 117 (2d Cir. 1972), cert. den., 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972), the government delayed for 13 days in obtaining the required seal. By way of explanation, the government stated that it thought only the "issuing justice" (under a New York statute) could order the sealing and that he was on vacation when the wiretap was terminated. The court held that this explanation was satisfactory where no evidence of tampering was presented.
 
 
 29
 Four years later, the Second Circuit examined the subject again in United States v. Gigante, 538 F.2d 502 (2d Cir. 1976). In Gigante, the court excluded wiretap evidence due to an (8)(a) violation, but the case should be read in the light of its admitted facts that the government conceded that no satisfactory explanation was available, the delays in sealing ranged from 8 months and 12 days to 12 months and 25 days, and there were numerous irregularities in the storage process. Poeta was cited with approval in Gigante and distinguished on the ground that the government in Gigante conceded that no explanation for the delay could be given. Furthermore, the Gigante opinion remanded the case with respect to another set of tapes to see if the government could explain delays of 6 and 37 days.
 
 
 30
 However, the discussion in Gigante indicates that the Second Circuit has adopted a more strict approach than that used in the Third, Fifth and Seventh Circuit cases discussed above. The court stated that the defendant should not have to prove tampering as a prerequisite to suppression of evidence. Thus, Gigante may imply that a lack of tampering, in and of itself, will not be a satisfactory explanation, and will not satisfy the Chun test.
 
 
 31
 More recently, and subsequent to Gigante, the Second Circuit affirmed without opinion a district court decision which found a satisfactory explanation for 24 and 42 day delays. United States v. Caruso, 415 F.Supp. 847, 850-51 (S.D.N.Y.1976), aff'd without opinion, 553 F.2d 94 (2d Cir. 1977). With respect to the 42 day delay, the district court gave only the bare conclusion that based on all the evidence a satisfactory explanation was given. On the 24 day delay, the court accepted the government's explanation that there was confusion in the district attorney's office because the wiretap was terminated prior to the date to which it originally had been authorized and that the assistant district attorney in charge of the case had been hospitalized. 415 F.Supp. at 850.
 
 
 32
 We think a summary of the Second Circuit cases indicates that Gigante has not significantly restricted the admission of evidence under § (8)(a) except perhaps to the extent that a lack of evidence of tampering, in and of itself, will not be enough to allow the admission of wiretap evidence where an (8)(a) violation has occurred.[5] Three other circuits have rejected the Second Circuit's approach and have held that a lack of any evidence of tampering goes either all the way, Diadone, supra, or a long way, Angelini, supra, Falcone, supra, toward overcoming an (8)(a) violation.
 
 
 33
 We agree with the Third, Fifth and Seventh Circuits that the purpose of the sealing requirement is to insure the integrity of the tapes. We further hold that an inquiry into this subject is appropriate in determining whether a satisfactory explanation has been provided. Since we find, however, a satisfactory explanation in this case based in part on considerations other than the fact that the integrity of the tapes is not challenged, we need not decide if we would allow the evidence to be admitted solely on the basis of the fact that no tampering has been shown.[6]
 
 
 34
 With this background in mind, we turn to the government's explanation in this case. We note that a finding of a satisfactory explanation is largely based on factual determinations which will not be reversed unless clearly erroneous. Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); United States v. Woodward, 546 F.2d 576 (4th Cir. 1976).
 
 
 35
 After hearing testimony on the question, the district judge held that the government had given a satisfactory explanation for the delay. He found:
 
 
 36
 "Here, a reasonable explanation for the delay has been offered by the government in that the original tapes were necessary in the event that the duplicate tapes could not mechanically provide the needed information in preparing warrants, indictment and transcripts from April 11, 1977 to May 20, 1977. Since duplicate tapes had malfunctioned in the past, there was no reason for the government to believe it could not happen again. The mere fact that agents have listened to the duplicate tapes during the course of the electronic surveillance would have nothing to do with a possible malfunction during the time warrants, indictment and transcripts were being prepared. Additionally, there was over 2000 hours of recorded communications intercepted and it is obvious that more detailed inspection of the tapes became necessary during the time of warrant, transcript and indictment preparation."
 
 
 37
 We do not feel that the district court's fact finding was clearly erroneous or that its legal conclusion that a satisfactory explanation was given is in error. The fact that the agents listened to the duplicate original tapes does not mean that they might not have needed the originals later on in checking the transcriptions, or that the more detailed listening required later on in preparing transcripts might not turn up problems or malfunctions that were overlooked in the previous, more cursory listening at the end of each day. Furthermore, the district court found as a fact that there had been malfunctions in the past. The possibility of a recurrence is a good reason to keep the originals on hand. Nevertheless, if the government had turned over the originals and problems had developed, access to the originals should not have presented an insurmountable problem. No reason is apparent why the government could not have obtained a court order to unseal the specific tapes it needed. Still, the possibility of a malfunction in one tape and not the other is not remote and the district court found that such malfunctions had occurred.
 
 
 38
 Additionally, several other factors in the case lend support to a decision to admit the evidence. First, it is not abundantly clear that the government violated the statute. The Assistant United States Attorney in charge of the case testified that he had obtained an oral sealing order from the district judge over the phone, although he was unable to recall the exact date. A good deal of testimony was heard in an effort to establish when and if this call occurred. The district judge felt that the order was most likely given after April 25, but he did not come to any final conclusion since he found in all events that there was a satisfactory explanation for the delay. At best, the record on this point is inconclusive. As stated earlier, the defendants probably are correct in arguing that we must assume the order was obtained on May 20; however, it should at least be noted that in other cases dealing with (8)(a) the violation by the government was clear, where, in our case, the government's greatest difficulty appears to have been in its inability to prove when the order was issued.
 
 
 39
 Another important factor in this case is the length of the delay (39 days at most). In the cases discussed above which refused to suppress such evidence in this setting the delays were 13 days (Poeta ), 14 days (Sklaroff ), two weeks (Diadone ), 9, 26 and 38 days (Angelini ), 24 and 42 days (Caruso ), 45 days (Falcone ), and 57 days (Lawson ). By contrast, the delays in Gigante, which excluded the evidence, ranged from 8 months and 12 days, to 12 months and 25 days. In Gigante, the Second Circuit distinguished Sklaroff on this ground, and the Seventh Circuit has distinguished Gigante on this ground. United States v. Angelini, 565 F.2d 469, 472 (7th Cir. 1977).
 
 
 40
 Finally, and just as important, the defendants do not allege and no evidence was presented to show that the tapes were tampered with or altered in any way. In fact, the record shows that the government was extremely careful to insure the integrity of the tapes. One F.B.I. agent, for example, testified to extra protection taken in this case:
 
 
 41
 "As extra security on this, so that I could be satisfied today that no one had had access to that envelope once I sealed it, I insured that every one of the envelopes that had an original tape and log inside had a piece of Scotch tape over at least one of my initials on the back of each envelope. The purpose of this was that if anyone would . . . attempt to get inside the envelope, not only would they tear the envelope, . . . they (would) break the seal where my initials were and I would be able to see (that) my initials had been torn, they were in ink with the Scotch tape over at least one of the initials, I felt like there was (no) way anyone could break that seal without me seeing it because . . . the Scotch tape would have pulled the initials apart."
 
 
 42
 The added protective measure was taken at the end of each day of recording and thus was done well before the tapes were belatedly judicially sealed. This extra protection further distinguishes the case at bar from Gigante. In Gigante, the court referred to the "haphazard procedures employed in this case," 538 F.2d at 505, and noted that "there were numerous irregularities. Some tapes were not given to Nalley (the special Agent in charge of the surveillance) personally, but were dropped in his mail folder. Others were not initialed, or lacked properly executed forms." Id. at 503, n. 1. Furthermore, as noted above, the Third, Fifth and Seventh Circuits apparently have held that a lack of any allegation of tampering is enough to permit the wiretap evidence to be introduced at trial.
 
 
 43
 We repeat that we feel the district court's finding of a satisfactory explanation was not in error. The integrity of the tapes is not questioned, and we take into account the extra precautions taken with respect to them. Therefore, the purpose of the sealing requirement has been fulfilled, and, as discussed earlier, this fact is important in deciding whether a satisfactory explanation has been provided. The government's explanation was reasonable and accepted by the district court which heard the witnesses Ore tenus in open court. The defendants have not shown actual prejudice in any way, and it is clear that the government did not delay the sealing in order to obtain any tactical advantage. To the extent the Gigante decision is contrary to the decision of the other circuits, we decline to follow it. However, we do not feel our decision necessarily conflicts with Gigante, for that case can best be explained by the inordinate length of the delay, the irregularities in the storage of the tapes, and the government's concession that no satisfactory explanation existed.
 
 
 44
 We admonish the government to be more careful in the future in complying with (8)(a). The facts of this case are rather unusual, and the only issue before us is whether the district court's finding of a satisfactory explanation was erroneous. This opinion should not be read as a license to disregard the sealing requirement.
 
 III
 
 45
 In their third assignment of error, the defendants argue that the district judge erred by refusing to recuse himself and be called as a witness on the issue of when he gave the oral sealing order. We do not feel the district judge was required to testify as to his judicial act in issuing the sealing order and thus was not required to recuse himself pursuant to 28 U.S.C. § 455.
 
 
 46
 The judgments of conviction are accordingly
 
 
 47
 AFFIRMED.
 
 K. K. HALL, Circuit Judge, dissenting:
 
 48
 I respectfully dissent. I think the defendants' convictions should be reversed in light of the government's unexplained failure to immediately secure judicial sealing of its wiretap evidence, as required by 18 U.S.C. § 2518(8) (a).
 
 
 49
 The clear language of that statute requires one of three things: immediate judicial sealing of the evidence, a satisfactory explanation for its failure to do so, or suppression of the evidence at trial. Here, the evidence was not immediately sealed, and the government's purported explanation is wholly unsatisfactory. I think we are directly confronted with the difficult issue of suppression, and should give effect to Congress' intent to exclude the evidence from trial. Because its admission in this case was not harmless error, I would reverse.
 
 
 50
 The government explained its failure to seal the wiretap evidence by claiming that F.B.I. agents in charge of the surveillance needed to maintain custody of the original tapes until they ascertained that the duplicates were audible. The district court accepted this explanation and the majority thinks it is not clearly erroneous.[1] However, the government's rationale is fatally undercut by the uncontradicted testimony of the F.B.I. agent in charge of the surveillance, that he and an associate had listened to the duplicate tapes almost on a daily basis during the surveillance, and that after the surveillance ended, they had listened to all of the duplicate tapes by about April 15. Thus, the government's explanation covers only the period from April 11 to April 15; yet the tapes were not judicially sealed until May 20. I think the government has failed to provide a "satisfactory explanation" for its noncompliance with the requirements of § 2518(8)(a).
 
 
 51
 Given such failure, I think the real issue in this case is whether § 2518(8) (a) requires the "Draconian remedy" of suppression. The plain language of the statute requires this result, and I think we should decline to create a judicial exception to that language, where the result dilutes a significant protection afforded by Congress to citizens under government surveillance.
 
 
 52
 Although this difficult issue is one of first impression for our court, four other circuits have analyzed the suppression question with varying results. The Third Circuit has held that, since the purpose of § 2518(8)(a) is to ensure the integrity of tape recordings after interception, violation of the sealing requirement is not sufficient for suppression where the trial court finds that "the integrity of the tapes (is pure)." United States v. Falcone, 505 F.2d 478, 483-84 (3rd Cir. 1974), Cert. denied, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975). The Fifth and Seventh Circuits have since agreed with this analysis. United States v. Sklaroff, 506 F.2d 837 (5th Cir. 1975);[2] United States v. Lawson, 545 F.2d 557 (7th Cir. 1975). The majority agrees with this rule requiring proof of tape tampering.
 
 
 53
 Judge Rosenn dissented in Falcone, and his views were later adopted by the Second Circuit in United States v. Gigante, 538 F.2d 502 (2nd Cir. 1976). Judge Rosenn argued that "the strict sealing requirement 'directly and substantially implements the congressional intention' of maintaining the integrity of the tapes. Therefore . . . the majority is unjustified in creating an exception to the express language of § 2518(8)(a)." United States v. Falcone, 505 F.2d at 488. I agree.
 
 
 54
 The language of the statute is unambiguous and its purpose is clear. Congress intended to provide protection from potential abuses of the wiretap license, by requiring strict judicial supervision over tape recordings immediately after the period of surveillance ends. Cf. United States v. Giordano, 416 U.S. 505, 514-15, 527-28, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). This is an external safeguard against tampering and it is eviscerated by a rule requiring actual proof of tampering. Tampering is difficult if not impossible to prove, given the sophisticated state of the electronics art.[3] We should not cast this burden upon the defendants who have no knowledge about the recording and custody of the tapes, and we should not bog down the trial court in a time-consuming, expensive and entirely collateral "battle of the experts" on the tampering issue. The government benefitted by the terms of the statute and should live with the consequences expressly imposed by Congress for its violation.
 
 
 55
 The majority's analysis of the suppression issue by reference to § 2518(10) (a),[4] is wrong because the statute at issue here, § 2518(8)(a), contains its own suppression provision. This sidestep approach was taken by the Third Circuit, after it in effect "wrote out" the strict suppression requirement of § 2518(8)(a):
 
 
 56
 . . . (the statute) provides that the 'presence of (a) seal . . . or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use . . . of any (wiretap). . . .' By this provision Congress has provided for an alternative to the sealing requirement. It would follow from such an alternative that failure to seal the tapes promptly is not such a violation that requires suppression as a matter of law.
 
 
 57
 United States v. Falcone, 505 F.2d at 484.
 
 
 58
 I think this reasoning is fallacious. Where Congress has expressly provided one alternative to the immediate sealing requirement a reasonable explanation for the delay it does not follow that a second, unwritten alternative may be inferred.[5] Section 2518(8)(a) states that one of two express conditions Shall be a prerequisite for admission of the evidence. Therefore, where tapes have not been immediately sealed and the government does not give a satisfactory explanation for its non-compliance, the evidence must be suppressed under the independent aegis of § 2518(8)(a) without reference to the general suppression provision.
 
 
 59
 I realize that reversal of these convictions would put to naught countless hours of investigation and preparation by the government, and voids a conviction obtained after a trial which lasted 21/2 months and was otherwise error free. However, the statute mandates this result; and the courts have warned time and again that the procedures of § 2518(8)(a) are not mere technicalities to be ignored. E. g., United States v. Falcone, 505 F.2d at 484; United States v. Lawson, 545 F.2d at 564.[6]
 
 
 60
 This court should not be swayed by its own view as to the desirability of suppression in this instance. We deal not with the judicially created exclusionary rule, but rather with a remedy created by Congress. As Chief Justice Burger wrote in the now famous "Snail Darter Case":
 
 
 61
 Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto. . . .
 
 
 62
 (I)n our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with 'commonsense and the public weal.'
 
 
 63
 Tennessee Valley Authority v. Hill, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).
 
 
 64
 The court below excused the government's non-compliance partly because the government promised, in effect, to "do better next time." The majority admonishes the government "to be careful in the future." Such promises and admonitions cannot substitute for statutory protections created by Congress for the benefit of citizens who have been subjected to clandestine surveillance by the government.
 
 
 65
 I respectfully dissent.
 
 
 
 [1]
 For only one example, there was evidence that one Mahaffey repeatedly purchased stolen engines from those convicted which were delivered to him from New York by one or more of the transporters. Some of the engines Mahaffey purchased had not been removed from their chassis by tools, rather by cutting hoses, wires, motor mounts, transmission mounts, and even drive shafts, from which the inference might have been drawn that Mahaffey knew he was dealing with thieves and their confederates. A delivery of stolen engines to Mahaffey in his absence was made to one Burnham, a local distributor, who was convicted. The price for that load was $450 for eleven engines. There was also evidence that many of the engines delivered by Robertson or his employees had their engine motor numbers ground off
 
 
 [2]
 We attach no significance to the fact that the order was given orally, although the record reflects that the district judge's past practice (better, as the district court acknowledged) had been to issue such orders in writing. See United States v. Gigante, 538 F.2d 502, 507 (2d Cir. 1976)
 
 
 [3]
 § (10)(a) was amended later in 1978, after these convictions, in particular not pertinent here. P.L. 95-511, October 25, 1978
 
 
 [4]
 The court did mention the satisfactory explanation provision and gave as an example that police confusion had constituted a satisfactory explanation in another case. However, it did not hold that a satisfactory explanation was given in the case before it
 
 
 [5]
 United States v. Ricco, 421 F.Supp. 401 (S.D.N.Y.1976), aff'd on other grounds, 566 F.2d 433 (2d Cir. 1977), was decided under New York law. Where the integrity of the tapes was in question, that case found an unsatisfactory explanation for a delay in sealing
 
 
 [6]
 The defendants have made no effort to attack the integrity of the tapes. They take the position that such a task is unfeasible and Herculean. Their basic argument, distilled, is that they claim the fact is irrelevant
 
 
 [1]
 In most of the cases involving failure to comply with § 2518(8)(a) the government has given as its "reasonable explanation" the necessity to ascertain that duplicate tapes were audible before sealing original tapes. However, those duplicates were "duplicates" in the usual sense of the word copies made from the originals. Here, the F.B.I. made originals and duplicate originals simultaneously, and I perceive nothing in the simultaneous recording procedure which would render the former more reliable than the latter. In United States v. Angelini, 565 F.2d 469, 472 (7th Cir. 1977), Cert. denied, 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978), the court noted: "The difficulty, from the Government's point of view, and the reason we consider the present case as a close one, is that there were available alternatives which might have allowed immediate sealing and yet preserved a first quality tape for clarifying the inaudible portions. The Government might have made duplicate original tapes . . . (i)n the future, the Government, it appears to us, would be well advised . . . to use such a method . . . ."
 
 
 [2]
 See also United States v. Cohen, 530 F.2d 43 (5th Cir. 1976), Cert. denied, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1977). In both Sklaroff and Cohen the analysis of the court is somewhat unclear. In both cases the court held that "proof of tampering" is a necessary element for suppression under § 2518(8)(a); however, in both cases the court appears to have accepted the government's reasons for non-compliance as "reasonable explanations." In addition, the Sklaroff court appears to have considered a delay of 14 days in sealing to be substantial compliance with the immediacy requirement. United States v. Sklaroff, 506 F.2d at 840-41; United States v. Cohen, 530 F.2d at 46
 
 
 [3]
 "Tape recorded evidence is uniquely susceptible to manipulation and alteration. Portions of a conversation may be deleted, substituted, or rearranged. Yet, if the editing is skillful, such modifications can rarely, if ever, be detected." United States v. Gigante, 538 F.2d at 505. And, as Judge Rosenn cogently noted, "(F)act finding by the district court is inherently less reliable than a strict sealing requirement." United States v. Falcone, 505 F.2d at 488 (dissenting opinion)
 
 
 [4]
 18 U.S.C. § 2518(10)(a) provides, in pertinent part:
 Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that
 (i) the communication was unlawfully intercepted;
 (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
 (iii) the interception was not made in conformity with the order of authorization or approval.
 
 
 [5]
 As is apparent, I read the Third Circuit's language to mean that a showing of no tampering is a third alternative to the suppression requirement of § 2518(8)(a). The dissenting judge there read the majority's holding to this effect. However, a possible alternative reading that the government's explanation for non-compliance will always be deemed satisfactory where the integrity of the tapes is pure is also illogical. Under this rationale, the government's negligence or even willful noncompliance could be excused. I think this an untenable result, totally at odds with the statute's focus on judicial supervision of the wiretap process
 
 
 [6]
 "(W)e again urge the government to comply with statutory wiretap requirements both pre-interception and post-interception to the fullest extent possible, rather than to continue its unenthusiastic approach for the 'technical' requirements demonstrated in this particular case."