STATE

v.

**Roderick CAMPBELL et al.**

**85–275 C.A.**

Supreme Court of Rhode Island.

June 26, 1987.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Jane M. McSoley, Asst. Attys. Gen., Providence, for plaintiff.

Edward J. Romano, Providence, for defendant.

## OPINION

FAY, Chief Justice.

In the matter before us, defendant Roderick Campbell (Campbell) was convicted

by a Superior Court jury of possession of phencyclidine (PCP), possession with intent to deliver PCP, and conspiracy to possess with intent to deliver PCP, in violation of G.L. 1956 (1982 Reenactment) chapter 28 of title 21, the Rhode Island Uniform Controlled Substances Act, and was sentenced to serve twenty years.[1] On appeal, Campbell contends that the trial justice should have suppressed information obtained from wiretaps that led to his arrest, alleging that the information was gathered in violation of G.L. 1956 (1981 Reenactment) chapter 5.1 of title 12, the statute that governs the interception of wire and oral communications (Wiretap Act). We disagree and sustain Campbell's conviction.

Campbell was arrested and subsequently convicted as a result of an elaborate police investigation into a scheme to manufacture, deliver, distribute, and sell narcotics. The investigation, as it pertains to this appeal, involved a confidential informant and three consecutive wiretaps. The surveillance in question began in February of 1983, when the presiding justice of the Superior Court signed an order for a wiretap on the telephone of Daniel "Meatloaf" Carlson. From information gleaned from that wiretap, the State Police determined that Dorothy and Dennis LaChappelle were supplying narcotics to Carlson. In March of 1983 the Attorney General applied for and received permission to wiretap the LaChappelle's telephone. As a result of that interception, information provided by the informant, and other investigative work, the police were led to suspect defendant Campbell of manufacturing PCP and other controlled substances for sale to the LaChappelles and others.

In May of 1983 the Attorney General submitted an application to the presiding justice seeking permission to wiretap the business-telephone lines of the Philip A. Hunt Chemical Corporation where Campbell was employed as a chemist. The application was based largely on information in an accompanying affidavit that it incorporated by reference. The affidavit, signed

by Detective Gerald Prendergast (Prendergast) of the State Police, detailed the results of the wiretaps and surveillance that led the police to suspect Campbell's involvement. The presiding justice issued an order permitting the interception of Hunt Chemical Corporation's telephone lines on May 5, 1983, and on June 4, 1983, Campbell was arrested.

Before trial Campbell filed several motions to suppress for failure to comply with chapter 5.1 of title 12, all of which were denied. Campbell claims error in the denial of his motions, contending that (1) the wiretap application and order did not comply with § 12–5.1–2, (2) the application and order contain erroneous and intentionally misleading information, (3) no probable cause existed to support the issuance of the wiretap order, and (4) the wiretap application, certain orders, and the recordings of the intercepted conversations were not properly sealed in accordance with §§ 12–5.1–8 and –9.

I

Section 12–5.1–2 of the Wiretap Act provides that the Attorney General may apply ex parte to the presiding justice of the Superior Court for an order authorizing a wiretap and lists the required contents of such an application. Section 12–5.1–2(d) requires the submission of affidavits of persons other than the applicant in conjunction with the application "if they tend to support any fact or conclusion alleged therein."

Campbell argues that the Wiretap Act must be complied with strictly. Relying upon *State v. Sitko*, 460 A.2d 1 (R.I. 1983), for support, he contends that the application in this case must itself, without resort to the affidavit that it incorporates, fulfill the requirements of § 12–5.1–2. Although he does not dispute that the two documents together meet the statute's needs, he focuses exclusively upon the application and

1. Although several other defendants were originally involved in this case, this appeal involves

only defendant Campbell.

faults it for failing to fulfill several requirements.

We have admittedly insisted that there be strict compliance with the directives of our state wiretap legislation in order to ensure that an individual's privacy receives the full measure of protection required by the Fourth Amendment of the United States Constitution and the Declaration of Rights in the Rhode Island Constitution. *State v. Sitko,* 460 A.2d at 2–3, 6 ; *State v. Luther;* 116 R.I. 28, 29–30, 351 A.2d 594, 595 (1976); *State v. Maloof,* 114 R.I. 380, 389–90, 333 A.2d 676, 681 (1975). However, we find the level of formal compliance urged by Campbell in this case to border on the "hypertechnicality" we have consistently disfavored. *See State v. Pacheco,* 481 A.2d 1009, 1020 (R.I. 1984)(legal sufficiency of two-page affidavit submitted in support of application for a search warrant upheld in face of challenge on ground that jurat did not appear on same page as affiant's statement).

Campbell's reliance on *Sitko* is misplaced. In *Sitko* we held that the order for a wiretap "must contain within the four corners of the document a particular description of the type of communications to be intercepted" and found insufficient an order that incorporated sections of an application by reference for that purpose. 460 A.2d at 3. However, in *Sitko* the sufficiency of an order, not of an application, was in question. Noting that the order is "the functional equivalent of the warrant in a conventional search," we emphasized that "it is the order and not the application that authorizes the wiretap. * * * [The order] is the document that sanctions and, more importantly, places the limits on police activity." *Id.* at 4. This concern with providing the police, who "are not familiar with the many explicit conditions and circum-

stances that are detailed in § 12–5.1–5" relative to the form and content of an order, with definite guidelines to regulate surveillance, also informs our insistence in *Sitko* that the description in the order of the type of communications to be intercepted be highly particularized. *Id.* at 5–6.

■ An application, on the other hand, is directed to the presiding justice of the Superior Court, who clearly must be aware of what it must contain, since according to § 12–5.1–4 he or she must make specific determinations before issuing an order relating directly to information required by § 12–5.1–2 to be in the application and by § 12–5.1–2(d) to be in affidavit form; moreover, according to § 12–5.1–5, the order he or she issues must detail much of that same information. The rationale for prohibiting the incorporation of an application into an order for the purpose of satisfying the statute does not therefore apply to the incorporation of an affidavit into an application for that purpose. We accordingly hold that when, as here, an application specifically incorporates an affidavit by reference, the affidavit is presented to the presiding justice at the same time as the application, and the application and affidavit together provide the information required by § 12–5.1–2, the requirements of the statute are satisfied.

## II

Campbell contends that the application is erroneous and intentionally misleading in that it informs the presiding justice that he is among the class of persons who have committed or were about to commit second and subsequent offenses of the Uniform Controlled Substances Act, and nowhere in the affidavit or application is it alleged that he had ever committed a previous narcotics offense.[2] He cites the finding by the pre-

---

**2.** Campbell finds offensive the statement by the Attorney General in the application that

 "he does believe that persons hereinafter more fully described have committed, are committing or are about to further commit the following designated offenses as defined in Section 21–28 of the General Laws, to wit: *second and subsequent offenses of narcotics violations of Section 21–28–2.08 of the General*

*Laws, as amended, in violation of Section 21–28–4.01(A)(2)(a) of the General Laws,* and conspiracy to violate said Sections of the General Laws." (Emphasis added.)

 In a subsequent paragraph of the application, the Attorney General defined as the objective of the wiretap

 "to identify all co-conspirators with Dr. Roderick A. Campbell * * * and to obtain suffi-

siding justice in the order that there was probable cause to believe that Campbell and others were involved in second and subsequent violations of the act as proof of the fact that the justice relied heavily on the misrepresentations in the application. Campbell maintains that the actions of the state in this regard violated the rule in *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

■ Under *Franks v. Delaware* for a search warrant to be voided and the fruits of the search excluded from evidence because of an allegedly false statement in an affidavit, the false statement must have been necessary to the finding of probable cause to search. 438 U.S. at 155–56, 98 S. Ct. at 2676, 57 L. Ed. 2d at 672. Applying *Franks* to the circumstances in this case, the trial justice determined that the language complained of by Campbell was surplusage and that sufficient probable cause existed without it to issue the wiretap order. We agree.

The "second and subsequent offense" language in the application is clearly directed at the enhanced-punishment provision in the Uniform Controlled Substances Act. *See* § 21–28–4.11.[3] It is not essential to the description of the offense itself required for purposes of § 12–5.1–2(b)(2)(i) of

the Wiretap Act, which is the substance of the first paragraph complained of.[4] The statement of the objectives of the wiretap, the second paragraph complained of, attempts to qualify the "second and subsequent offense" language to apply only to those who are eventually found to have had a previous conviction. When the offending language is excised from these sections, the application describes offenses sufficient to satisfy the requirements of § 12–5.1–2(b)(2)(i)—namely, "narcotics violations of Section 21–28–2.08 * * * in violation of Section 21–28–4.01(A)(2)(a) * * * and conspiracy to violate said sections"—and defines as the objective of the wiretap the obtaining of sufficient evidence to convict the coconspirators of these offenses.[5] As we shall shortly see, the Prendergast affidavit provides ample support for the determination that probable cause existed to believe that these offenses had been, were being, or were about to be committed; that the wiretap would achieve its objective; and thus that the wiretap order should issue. That the order issued by the presiding justice tracks the "second and subsequent" language in its statement regarding probable cause is of little consequence since, to state the obvious, in order to find probable cause with regard to a second and subsequent offense, the presiding justice

---

cient evidence to convict them of criminal narcotics business in violation of Section 21–28 of the General Laws, to wit: *second and subsequent offenses of narcotics violation of Section 21–28–2.08 of the General Laws, as amended, in violation of Section 21–28–4.01 (A)(2)(a) of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1982), that is, where an individual has a previous conviction for violation of narcotic offenses, where appropriate, and conspiracy to violate the above-listed offenses."* (Emphasis added.)

**3.** General Laws 1956 (1982 Reenactment) § 21–28–4.11 provides:

"Second or subsequent offenses.-(A) Any person convicted of a second or subsequent offense under this chapter may be imprisoned for a term up to twice the term otherwise authorized, fined an amount up to twice that otherwise authorized, or both.

(B) For purposes of this section, an offense is considered a second or subsequent offense, if prior to his conviction of the offense, the offender has at any time been convicted under this chapter or under any statute of the

United States or of any state relating to narcotic drugs, marijuana, depressant, stimulant, or hallucinogenic drugs."

**4.** General Laws 1956 (1981 Reenactment) § 12–5.1–2(b)(2) requires the application to contain "[a] full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued, including: (i) details as to the particular designated offense that has been, is being, or is about to be committed * * *."

**5.** Section 21–28–2.08 divides controlled substances into five "schedules"; PCP is listed as a schedule II substance. According to § 21–28–4.-01(A), as amended by P.L. 1982, ch. 151, § 1, "it shall be unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver a controlled substance[,]" and subsection (2)(a) provides that any person who violates the section with respect to schedule I or II substances "is guilty of a crime and upon conviction may be imprisoned for not more than thirty (30) years, or fined not more than fifty thousand dollars ($50,000) or both."

had to find probable cause with regard to the offense itself.

Although these portions of the application might well have been more carefully worded, we agree with the trial justice that this was not an adequate ground upon which to quash the order. *Cf. Commonwealth v. Assad*, 393 Mass. 418, 422, 471 N. E. 2d 1290, 1294 (1984)(although affidavit in support of wiretap application erroneously stated that defendant had previously been indicted and convicted of federal gaming violations, balance of affidavit presented sufficient probable cause to believe that defendant was involved in illegal gaming conspiracy and thus to issue order).

### III

Section 12–5.1–4 requires the presiding justice to make several specific probable-cause determinations on the basis of the facts submitted by the applicant before he or she can issue a wiretap order. Campbell contends that the information supplied in the Prendergast affidavit was unreliable, unsubstantiated, and uncorroborated hearsay and lacked hard facts to establish probable cause. We disagree.[6]

We have recently established that the standard set by the United States Supreme Court for reviewing an affidavit in support of a search warrant in *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), applies in electronic surveillance situations as well. *State v. McGoff*, 517 A. 2d 232, 235–36 (R.I. 1986). Thus the task of the presiding justice here was to "make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowl-

edge' of persons supplying hearsay information, there [was] a fair probability," 462 U.S. at 238, 103 S. Ct. at 2332, 76 L. Ed. 2d at 548, that Campbell and others were committing, had committed, or were about to commit violations of the specified sections of chapter 28 of title 21 and conspiracy to violate those sections; that particular communications concerning these offenses would be obtained through the interception; and that the facilities at Hunt Chemical were being used or were about to be used in connection with the offenses, or were leased to, listed in the name of, or commonly used by Campbell, § 12–5.1–4. Our task on review is to "ensure that the magistrate had a 'substantial basis for * * * conclud[ing]' that probable cause existed." 462 U.S. at 238, 103 S. Ct. at 2332, 76 L. Ed. 2d at 548.

The Legislature has also provided statutory guidelines for evaluating the facts presented by an applicant for a wiretap order. According to § 12–5.1–2(d), applications may be based, in whole or in part, on the statements of persons other than the applicant as long as the source of the information "is disclosed or described, and the application * * * contain[s] facts establishing the existence and reliability of the informant, or the reliability of the information supplied by him. The application must also state, so far as possible, the basis of the informant's knowledge or belief." The striking similarity between this statutory language and the "two-pronged" *Aguilar-Spinelli* test traditionally applied to information obtained from a confidential informant has been recognized by jurisdictions having a similar legislatively mandated standard for the issuance of wiretap orders.[7] *See State v. Ross*, 194 Conn. 447,

---

**6.** The state contends that Campbell failed to raise this issue below and is therefore precluded from raising it now. At a hearing on the several motions to suppress on September 11, 1984, Campbell's counsel adopted arguments made in oral form and in memoranda by attorneys for defendants LaChappelle and Carlson; the trial justice made it clear that his decision regarding those arguments applied to all the parties. Although it is admittedly difficult to determine exactly which arguments were adopted by Campbell given the number of issues raised by the several defendants in this case, we have

elected to give him the benefit of the doubt and to treat the issue as raised.

**7.** This test, first articulated in *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and later reaffirmed in *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969), required a "showing of 'some of the underlying circumstances' relating both to the informer's conclusion that the law is being violated (or that the objects to be sought may be found where he claims they are located) and to the affiant's conclusion that his informer or the

463, 481 A.2d 730, 738 (1984); C. Fishman, *Wiretapping and Eavesdropping* § 70 (Lawyers Cooperative Publishing Co. 1978). Although the totality-of-the circumstances test enunciated in *Gates* has been held in many jurisdictions to have superseded the *Aguilar-Spinelli* test, we have held *Gates* to constitute a "retraction of the rigid application" of *Aguilar-Spinelli* and not an abandonment of the test itself and have continued to apply it in our historically "common sense" fashion. *State v. Pacheco*, 481 A.2d at 1021; *State v. Ricci*, 472 A.2d 291, 296 (R.I. 1984); *State v. Nerney*, 110 R.I. 364, 365-66, 292 A.2d 882, 883 (1972). Accordingly, we see no conflict between the constitutional and the statutory standards we rely upon here.

 Prendergast's affidavit, as incorporated into the Attorney General's application, was clearly sufficient under these standards. The affidavit recounts the history of the Carlson wiretap—from which it was determined that he was being supplied with PCP by the LaChappelles—and of the subsequent LaChappelle wiretaps. It indicates that numerous calls were placed from the LaChappelle telephone by Dorothy LaChappelle to numbers listed to Hunt Chemical asking for Campbell by name and that Campbell was contacted only at these numbers. A confidential informer also told Prendergast that the "Rod" mentioned often in other intercepted LaChappelle conversations might be Campbell and that he worked as a chemist at Hunt Chemical.

Recorded conversations indicated that Dennis LaChappelle was planning to travel to North Carolina to sell or trade PCP for moonshine on March 15, 1983, after he met his supplier; that Campbell knew of these plans and was to meet Dennis before he left; and that when the meeting could not take place because Campbell was busy, Dennis's trip was delayed. The name "Rod" was mentioned often in intercepted conversations in conjunction with Dennis's plans and the delivery of the "regular" and "the other."

A blue GMC truck determined to be Campbell's was seen by police surveillance at the LaChappelle residence both before and after March 15, once driving by the house without stopping when other cars were in the driveway—a factor acknowledged by Dorothy in a later telephone conversation with the statement that "Rod * * isn't going to stop when cars are around."

On March 22, 1983, a meeting between Dennis and Campbell, which they arranged over the phone, took place in a restaurant, at which time a State Police detective overheard conversations in which "a new substance—a schedule IV" was mentioned and statements made that "you have to know how to push your product; nothing wrong in trying something new."

In a conversation on April 1, 1983, Campbell told Dennis that he had picked up "the golden nugget," and they arranged to meet at a restaurant. Campbell arrived with two other people, both of whom were said by Dorothy in a subsequent telephone conversation to be "dealing" with Campbell and one of whom was later found to have been mentioned in a 1982 police report referring to information that he had bought a chemical from Campbell and sold it as cocaine. Two members of the State Police also told Prendergast of an earlier raid on C & S Manufacturing Company in Central Falls, during which formulas for schedule I and II substances were seized, as were a number of chemicals from which it was possible to produce the illegal drugs. Campbell was listed as president of this company at the time of the raid.

On April 4, 1983, Campbell was seen by police entering the LaChappelle residence carrying a paper bag. After he left, conversations between Dennis and his customers were recorded, indicating that he had a supply of PCP and would drop it off to them.

The affidavit also attests to the reliability of the sources of this information. Prendergast himself had been a member of the Division of State Police for eleven years and was in charge of the entire PCP investigation. His primary sources were the Carlson and LaChappelle wiretaps as

information he supplies is trustworthy." *State* *v. Ricci*, 472 A.2d 291, 294 n.3 (R.I. 1984).

corroborated by reports of other members of the State Police drawn from their own personal knowledge. That Campbell was the speaker in the conversations referred to, a conclusion he disputes, cannot seriously be questioned since he was always asked for by name and subsequently showed up at the meetings arranged. Although the background of the "confidential informer" or the source of his or her information that "Rod" might be Campbell is admittedly not detailed, this information was corroborated by the LaChappelle wiretaps and the independent investigation conducted by the police.

The trial justice thus clearly had a substantial basis for concluding that probable cause existed to issue the order to wiretap the Hunt Chemical telephone lines, and we find Campbell's contentions to the contrary to be without merit.

### IV

Finally, Campbell argues that several documents and a second set of tapes, recorded by police simultaneously with the original set, were not properly sealed in accordance with the requirements of the statute. One of these documents was a toxicology report, described in full in the body of Prendergast's affidavit in support of the Carlson wiretap and referred to as "attached to this affidavit and made a part hereof." The report established that a white powdery substance purchased from Carlson by an informant on January 6, 1983, was PCP.[8] Although the affidavit itself was placed under seal together with the application and order for the Carlson wiretap, the toxicology report was given to

---

8. Campbell challenges the legality of both the Carlson and the LaChappelle wiretaps in an attempt to prove that the evidence derived therefrom, which led ultimately to the interception of the Hunt Chemical telephone lines, was tainted.

9. Section 12–5.1–2(d) provides in pertinent part: "If the applicant's information and belief is derived from tangible evidence or recorded oral evidence, a copy or detailed description thereof should be annexed or included in the application. Affidavits of persons other than the applicant must be submitted in conjunction with the application if they tend to support any fact or conclusion alleged therein."

Prendergast by the presiding justice after he reviewed it and was kept in Prendergast's custody at State Police headquarters until the time of the hearings. Prendergast testified that the contents of the report were not divulged to any person not involved in law enforcement or working on the investigation.

Section 12–5.1–8(b) requires that "[a]pplications made and orders granted under this chapter shall be sealed by the presiding justice of the superior court[,]" and § 12–5.1–12 provides that grounds for suppression of evidence derived from a wiretap may exist if "[t]he seal provided [for] in subsection (b) of § 12–5.1–8 is not present and there is no satisfactory explanation for its absence."

We agree with the trial justice that the statute does not require that all the papers submitted in support of an application in accordance with § 12–5.1–2(d) be sealed.[9] However, in this case the affidavit was incorporated into the application and the toxicology report was in turn incorporated into the affidavit. Even if we consider all these papers together as "the application," however, we are of the opinion that the failure to seal the toxicology report along with the balance of the application did not require suppression since a satisfactory explanation existed for that failure.

The purpose behind the sealing requirement in § 12–5.1–8(b), as in its federal counterpart, is the preservation of the confidentiality of the government's investigation and the authenticity of the documents for the purpose of review.[10] See United States v. Florea, 541 F.2d 568, 575 (6th Cir.

---

10. Our state wiretap legislation was modeled after title III of the Omnibus Crime Control and Safe Streets Act enacted by Congress in 1968 and codified as 18 U.S.C.A. § 2510 to 2520 (1970). Although we have departed from the federal courts in insisting that there be strict, rather than substantial, compliance with certain sections of the state statute, see State v. Sitko, 460 A.2d 1, 3 (R.I. 1983), and State v. Ahmadjian, 438 A.2d 1070, 1083 (R.I. 1981), the legislative goals of the two acts are clearly comparable.

1976), *cert. denied,* 430 U.S. 945, 97 S. Ct. 1579, 51 L. Ed. 2d 792, *reh. denied,* 431 U.S. 925, 97 S. Ct. 2201, 53 L. Ed. 2d 240 (1977); 1968 U.S. Code Cong. and Admin. News 2112, 2194. The Fifth Circuit has held that technical noncompliance with the federal provision does not warrant suppression when the procedures followed fulfill this purpose, the defendant claims no prejudice as a result of the noncompliance, and the provision is not deliberately circumvented. *United States v. Caggiano,* 667 F.2d 1176, 1178–79 (5th Cir. 1982); *cf. Salzman v. State,* 49 Md. App. 25, 47, 430 A.2d 847, 860 (1981)(no violation when procedures followed were consistent with basic purpose of statute). The Fourth Circuit has found similar factors relevant in determining whether a "satisfactory explanation" exists for the failure to seal tape recordings of intercepted conversations so as to avoid the exclusion of the contents of such tapes from evidence. *United States v. Diana,* 605 F.2d 1307, 1312–13 (4th Cir. 1979); 18 U.S.C.A. § 2518(8)(a).[11]

We consider these factors to be similarly relevant in determining whether there was a satisfactory explanation for the failure to seal the toxicology report in this case. The noncompliance here was clearly technical since the information in the report was detailed in the affidavit itself, which was placed under seal. Campbell does not claim that he was prejudiced by the noncompliance; undisputed testimony indicated that the confidentiality and authenticity of the report was maintained by the alternative procedures employed; and there is no evidence that the sealing requirement was deliberately circumvented. Accordingly we find the failure to seal the toxicology report satisfactorily explained

for purposes of § 12–5.1–12 and suppression not warranted.

Campbell further maintains that the sealing requirement in § 12–5.1–8(b) applied to a minimization order granted by the presiding justice on March 28, 1983, concerning the hours of the LaChappelle wiretap; to a March 21, 1983 application for minimization, denied and subsequently destroyed, and to the "continuation" orders the trial justice issued both upon the denial of minimization requests and after he reviewed the weekly progress reports he had ordered in the exercise of the discretion afforded him by § 12–5.1–5(c).[12] None of these documents were placed under seal.

 The sealing provisions in § 12–5.1–8(b) apply to those "applications made and orders granted under this chapter." When a particular statutory provision is part of a single statutory scheme, legislative intent must be gathered from an examination of the entire statute rather than one part only. *In re Rhode Island Commission for Human Rights,* 472 A.2d 1211, 1212 (R.I. 1984). We therefore agree with the trial justice that the language in § 12–5.1–8(b) refers to those applications and orders the requirements for which are specifically set out in the rest of the statute—*see* §§ 12–5.1–2, –4, and –5 regarding initial authorizations; § 12–5.1–5(b) regarding extensions of such orders; and § 12–5.1–6 regarding orders of approval of interceptions relating to an offense other than that specified in the order of authorization—and not to other requests made and denied or authorized intermittently throughout the surveillance. Continuation orders are not even mentioned by the statute; in effect they merely continue what has already been authorized in an order

---

**11.** 18 U.S.C.A. § 2518 (8)(a) requires that recordings of intercepted communications be sealed immediately upon the expiration of the period of the order or any extension thereof, and further provides that "[t]he presence of the seal * * * or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517." Section 12–5.1–8(a) of our wiretap act essentially duplicates the federal provision.

**12.** Section 12–5.1–5(c) provides:

"Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the presiding justice of the superior court who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continuing interception. Such reports shall be made at such intervals as the presiding justice of the superior court may require."

that is required to be sealed. Minimization requests and orders are also not mentioned. If such requests are denied, the sealed authorization is again not modified. If they are granted, the authorization is admittedly modified but the intrusion is reduced, rather than expanded; furthermore, the testimony indicated that a signed photocopy of the minimization order at issue here was kept in the custody of the police and was available for purposes of review. Accordingly, we do not find the failure to seal these documents to have warranted the suppression of the intercepts.

 Campbell also contends that the failure of the presiding justice to enter an order denying the March 21, 1983 minimization request prevented compliance with the inventory provisions of §§ 12–5.1–9(a), (b), and (c).[13] We merely note that the purpose of the inventory requirement is to provide the parties whose communications have been intercepted with notice of that fact and of the period of "authorized, approved, or disapproved" interceptions, so that they can seek redress, either through suppression under § 12–5.1–12 or in civil litigation under § 12–5.1–13, if they feel their privacy has been unlawfully invaded. *See* 1968 U.S. Code Cong. and Admin. News 2112, 2194, with regard to the federal counterpart of § 12–5.1–9. An order denying a request to minimize an already authorized and presumably inventoried order adds nothing to this information and is therefore appropriately not required by the statute to be inventoried.[14]

 Finally, the intercepted conversations in this case were recorded simultaneously on two separate tape recorders, resulting, according to Campbell, in the production of two original copies. As such, he contends, the failure to seal both sets of tapes constituted a violation of the provisions of § 12–5.1–8(a) and the results of those wiretaps should accordingly have been suppressed.

Although § 12–5.1–8(a) does require the sealing of the recordings made of intercepted conversations, it clearly provides that "[d]uplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (a) and (b) of § 12–5.1–10 for investigations." One of the sets of simultaneous recordings in this case was used as such a duplicate and the other was sealed in accordance with the statute. Testimony clearly showed that the "duplicate originals" were kept in the custody of the police under lock and key and were used only for the purposes authorized in §§ 12–5.1–10(a) and (b). As long as the authenticity of the recordings was preserved by the sealing of one of the "originals," we see no reason why the other could not be used as a duplicate. Although we recognize that there may be some slight technical discrepancies between two simultaneous recordings, no claim of prejudice was raised on this basis. Accordingly, we find Campbell's contention to be without merit.

For the reasons stated, the defendant's appeal is denied and dismissed, the Superior Court judgment is affirmed, and the papers in the case are remanded to the Superior Court.

---

**13.** Section 12–5.1–9 provides in pertinent part that within ninety days of the termination of an order, "the presiding justice * * * shall cause to be served on the person named in the order or application, and * * * other parties to the intercepted communications * * *
 (a) notice of the entry of the order or the application for a denied order of approval;
 (b) the date of the entry of the order or the denial of the application for an order of approval;
 (c) the period of authorized, approved or disapproved interception."

**14.** Section 12–5.1–9 requires only that an application for an order of approval or the denial of such an order be inventoried. An "order of approval" is a term of art under the statute. It refers to orders that must be obtained for interceptions relating to an offense other than that specified in the original order of authorization; an application complying with § 12–5.1–2 must be filed to obtain such an order. *See* § 12–5.1–6. The denial of a minimization request is accordingly not covered by this provision.